[NOTE. For suit for infringement of letters-patent No. 21,059, granted to Henry and Frederick I. L. Blandy for an improvement in "steam-engines," see Blandy v. Griffith, Case No. 1,529. For application to file a supplemental bill in the nature of a bill to review the decision in the foregoing case, see Blandy v. Griffith, Id. 1,530.]

## Case No. 1,529.

### BLANDY et al. v. GRIFFITH et al.

[3 Fish. Pat. Cas. 609; Merw. Pat. Inv. 97,705.] [1]

Circuit Court, S. D. Ohio. Sept. Term, 1869.

PATENTS FOR INVENTIONS — HOLLOW BED PLATE FOR ENGINES — INFRINGEMENT — PLEADING AND PROOF — ESTOPPEL BY FORMER SUIT — "INVENTION" — APPLICATION — NEGLECT TO MAKE — PUBLIC USE — RENEWAL OF APPLICATION — NOVELTY — PROPERTY RIGHTS IN PATENTS.

1. The improved bed plate patented to H. and F. J. L. Blandy, August 3, 1858, embraces these particulars: 1. A hollow continuous bed plate placed between the boiler and the engine. 2. The bed plate to have flanges on its upper and outer side cast with it. 3. The attachment and securing of the operative parts of the engine upon its upper and outer side by means of the flanges.

2. The rule is well settled in equity, that every material fact upon either side must be set up in the pleadings, and that the court can no more consider what is proved, but not alleged, than what is alleged but not proved.

3. Where the complainants insist upon an estoppel by a former suit between the same parties, the bill should have averred the judgment, in anticipation of the defense.

4. Invention is the work of the brain, and not of the hands. If the conception be practically complete, the artisan who gives it reflex and embodiment in a machine is no more the inventor than the tools with which he wrought.

[Cited in Yoder v. Mills, 25 Fed. 821; Johnson v. Forty-Second St., etc., R. Co., 33 Fed. 502.]

[See King v. Gedney, Case No. 7,795; Wellman v. Blood, Id. 17,385; Pitts v. Edmonds, Id. 11,191; Dental Vulcanite Co. v. Wetherbee, Id. 3,810.]

5. Mere mechanical skill can never rise to the sphere of invention. The latter involves higher thought and brings into activity a different faculty. Their domains are distinct. The line which separates them is sometimes difficult to trace; nevertheless, in the eye of the law, it always subsists.

[See Spaulding v. Tucker, Case No. 13,220; Barry v. Gugenheim, Id. 1,061; Decker v. Grote, Id. 3,726; Marsh v. Seymour, 97 U. S. 349.]

6. As long as the root of the original conception remains in its completeness, the outgrowth — whatever shape it may take — belongs to him with whom the conception originated.

7. The statute (section 7, Act [March 3] 1839 [5 Stat. 354]) is inflexible as to the time when the patent is to be applied for, with reference to the prior use and sale of the invention. The neglect to apply within two years after such sale or use, is inevitably fatal.

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission. Merw. Pat. Inv. 97,705, contains only a partial report.]

8. Where a patent was applied for May 3, 1856, and rejected August 30, 1856; amended specifications filed September 22, 1856, and finally rejected upon appeal to the commissioner, June 15, 1857, but not withdrawn. A new application made May 26, 1858, and patent granted August 3, 1858. Held: That the last application was in the nature of a petition for a review of the previous rulings, and related back to the prior application, and that the action of the commissioner was not original and independent, but a renewal and elongation of the former proceedings and a reversal of the former rejections.

[Cited in Goodyear Dental Vulcanite Co. v. Willis, Case No. 5,603; Weston v. White, Id. 17,458; Graham v. McCormick, 11 Fed. 862.]

9. Under such circumstances, the public use to avoid the patent must be for two years before the first application.

10. The delay from June 15, 1857, to May 26, 1858, was not, under the circumstances, unreasonable.

11. Whether two years would be a proper limit to establish for the renewal of an application after the rejection of a prior one, quaere.

[Cited in Goodyear Dental Vulcanite Co. v. Willis, Case No. 5,603; Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 501; Colgate v. Western Union Tel. Co., Case No. 2,995. Distinguished in Lindsay v. Stein, 10 Fed. 913.]

12. The bed plate covered by Blandy's patent is not a frame composed of hollow tubes, but a single continuous shell or tube, attached laterally to the boiler and having the engine attached laterally to it.

13. The question, upon the issue of novelty, is not whether the invention is better or worse than its predecessors, but whether it is new and useful, and different from anything before used or known.

14. The rights secured by a patent for an invention or discovery are as much property as anything else, real or incorporeal. The titles by which they are held, like other titles, should not be overthrown upon doubts or objections capable of a reasonable and just solution in favor of their validity.

15. The patent granted to H. & F. J. L. Blandy, examined and sustained.

In equity. This was a bill in equity [by Henry and Frederick J. L. Blandy] filed to restrain the defendants [Thomas Griffith and Francis Wedge] from infringing letters patent [No. 21,059] for "an improvement in steam engines," granted to complainants August 3, 1858. The invention consisted of a hollow bed plate, substantially in the form of an eight inch pipe, about eight feet in length, which was attached by feet or saddles to the side of the boiler of a portable engine. To the outside of this pipe the working parts of the engine were attached; being thus removed from contact with the boiler, and from the injurious effects of the unequal contraction and expansion of the boiler plates. The cylindrical form of the bed plate imparted great strength, while, as it was hollow, it was exceedingly light. The claim of the patent was as follows: "The application to portable steam engines of a hollow continuous bed plate, in the manner substantially as described, for the support and at-

tachment of the operative parts of the engine, whereby the latter, in working, is rendered independent of the contraction and expansion of the former, and the boiler relieved from the direct strain of the engine, as set forth." The defendants were using similar bed plates, except that a long, longitudinal strip was cut from the pipe on the side furthest from the machinery and next to the boiler, thus exposing the interior of the cylinder. The complainants used their bed plate as a heater also, by introducing water into the interior. The defendants used an auxiliary heater, which was located in the slot or opening of their bed plate. They insisted, by way of defense, that the invention was not new, but that it had been used prior to the invention of the patentees, in sundry places, in the form of an open frame, composed of four sides, each of which was a hollow tube, arranged in the form of a parallelogram and located on the top of the boiler. Upon this frame the machinery was placed. They also denied infringement.

The plaintiffs claimed that the defendants were estopped from denying the validity of the patent, by reason of a former judgment at law between the same parties, upon a suit for the infringement of the same patent. This point was not, however, made in the pleadings, but was founded upon the proofs and was urged in argument at the hearing. [Decree for complainants.]

A. W. Train, S. S. Fisher, Geo. Harding, and A. G. Thurman, for complainants.

F. Seborn, Geo. M. Lee, and C. D. Coffin, for defendants.

SWAYNE, Circuit Justice. I. The first question to be considered in this case is the proper construction of the patent to the complainants. In the specifications they say:

"Our improvement relates mainly to the construction of portable steam engines. The great desideratum in this class of machines is, to construct them so as to render them at once compact, yet simple; light, yet strong; and hence, available for the purposes of transportation.

"The nature of our improvement consists in the arrangement of a hollow continuous bed plate between the boiler and the engine, upon which, and to which, the entire working parts of the latter are supported and attached: the hollow bed plate being for this purpose provided with suitable flanges cast on its upper and outer sides, by which the operative parts of the engine are supported and secured to it; there being others cast on its under side, by means of which the bed plate itself is attached or riveted to the boiler. This hollow continuous casting, or bed plate, may be also used as a heater for the supply water. By this plan the engine will be rendered insulated, as it were, from the boiler, so that the relative position of its working parts to each other can not

be affected by the expansion and contraction of the boiler so as to impair their regular and easy working; and on the other hand, the boiler will not be subject to the injurious effects of the vibration and direct straining of the operative parts when at work. * * *

"The bed plate, if desired, may be used as a heater for the supply of water, by passing the exhaust steam, as it escapes from the cylinder, through a pipe suitably arranged within the bed plate; it (the bed plate) having been previously supplied with water, whence the steam is carried to the smokestack, so as to increase the draft of the furnace, and the heated water conducted to the force pump so as to be conducted into the boiler through the supply pipe.

"Having thus described our improvement, what we claim as new and desire to secure by letters patent, is the application to portable engines of a hollow continuous bed plate, in the manner substantially as described, for the support and attachment of the operative parts of the engine, whereby the latter, in working, is rendered independent of the contraction and expansion of the former, and the boiler relieved from the direct strain of the engine as set forth."

Fairly construed, we think the context claims for the patentees as their invention: 1. A hollow continuous bed plate placed between the boiler and the engine. 2. The bed plate to have flanges on its upper and outer side cast with it. 3. The attachment and securing of the operative parts of the engine upon its upper and outer side, by means of the flanges.

According to these views, the essence of the invention lies in two things: The construction of the bed plate and its lateral attachment to the engine, as set forth in the specifications.

The specifications and drawings show that the plummer block is fastened to the end of the bed plate on one side of the boiler, while the fly-wheel is on the other. This, it was said at the argument, balances the engine and gives harmony to its workings. It was insisted that this is the only arrangement which renders possible the lateral attachment of the engine to the bed plate, and that this attachment is not only the invention of the complainants, but is of the highest value in the construction of such machinery.

It is said in the specifications that the bed plate "may, if desired, be used as a heater for the supply water," and full directions are given as to the manner in which this object may be accomplished. But this is not an ingredient of the claim. It may be dispensed with at the option of the builder of the engine. The summary of the claims is silent in regard to it.

What is set forth as vital is the construction of the bed plate, and its attachment to the engine in the manner described. The leading objects of the invention are lightness, strength and the insulation of the engine

from the disturbing effects of the heat of the boiler.

II. Before the filing of this bill, the complainants sued these defendants and Washington Ebert, then constituting a copartnership, for the same infringement of the patent which has given rise to this litigation, and recovered a judgment by default for $168.91 damages, and costs. The bill is silent upon the subject of this judgment. The complainants insist that the defendants now before the court are estopped by it from setting up any defense which might have been made in that case. Whether this would be so if the bill contained the proper averments is a question we are not called upon to decide. We will only say, that in that case the question would have been one of grave importance. Aurora v. West, 7 Wall. [74 U. S.] 82; Beloit v. Morgan, Id. 622.

As the bill is framed, it is clear the judgment can not have the effect upon which the complainants insist.

The rule is well settled in equity, that every material fact upon either side must be set up in the pleadings, and that the court can no more consider what is proved but not alleged than what is alleged but not proved. Allegations are as necessary as proofs. Foster v. Goddard, 1 Black [66 U. S.] 518; Simms v. Guthrie, 9 Cranch [13 U. S.] 19; Harrison v. Nixon, 9 Pet. [34 U. S.] 483; Boone v. Chiles, 10 Pet. [35 U. S.] 183; Tripp v. Vincent, 3 Barb. Ch. 613; Bank v. Schultz, 3 Ohio, 61; Sadler v. Glover, 5 Dana, 552; Breckinridge v. Ormsly, 1 J. J. Marsh. 237.

If the complainants desired to bring the subject before the court as matter of estoppel, the bill should have averred the judgment. The defendants would have had the right to answer. The court would then have examined the subject in the light of the law and the evidence, and have come to such conclusions as the facts and the law, in their judgment, required. We overrule this proposition of the complainants as untenable.

III. It is insisted in the answers that the improvement patented was the invention of the defendant Wedge, and not of the complainants; that it was made and put into public use by the complainants, and was by them sold to others to be used, more than two years before they applied for the patent; and that before its supposed invention by the complainants, and two years before their application for the patent, it had been invented and discovered by others, and was in public use and on sale at the several places—and that such use was known to the several persons specifically mentioned.

(1.) It appears by the testimony that Wedge was the draftsman in the complainant's foundry. He devised the Hicks engine, as it is called. He says it was a copy from one he had seen in England. Some of the other witnesses say he found the design in a book he had borrowed. There was difficulty in removing the castings from the molds, and the parts did not fit well together. Frederick Blandy said that another like it should not be made. He suggested the plan of an engine substantially the same with that described in the patent, and marked a diagram to illustrate his ideas in the sand upon the floor. Wedge objected to it strenuously as of no value. Blandy replied that it could not turn out worse than the Hicks engine of Wedge, and directed him to prepare the drawings, and ordered the engine to be made. It was made accordingly, and was sold first to Wedge & Elliott, and afterward, with their consent, to De Graff. These facts touching the invention are proved by Blandy himself, and by Gordon and Fellows. About the time the drawings were made, Wedge showed them to Baldwin and told him that the plan was Blandy's.

Wedge was subsequently examined as a witness. He was wholly silent as to all this testimony. He neither denied nor attempted to explain. The facts are denied by no one. Nevertheless, Wedge testifies that the invention was his, and that in making the first engine he had "not a particle" of assistance from the complainants. There is also testimony that the complainants admitted the invention to be his.

Besides the testimony in support of the complainants' claim as the inventors, already adverted to, there are some additional facts of great weight and significance. The defendants and their copartner, Eberts, negotiated with the complainants for a license to use the invention. They also negotiated for the settlement of the suit commenced against them as infringers. The result was that they agreed to pay the amount for which the judgment was entered with costs, and to discontinue the use of the invention. During all this time no claim was set up by Wedge that he was the inventor. He was wholly silent. This is proved by Henry Blandy, and by Wedge's copartner, Eberts. The testimony also is uncontradicted and unexplained by Wedge, or by any other witness in his behalf.

There is no testimony in the record impeaching the character of any of the witnesses upon either side. The conflict is not irreconcilable. The error of Wedge arose probably from a misapprehension of the law. Having made all the drawings for the first engine, and superintended exclusively its construction, he finally came to the conclusion that he, and not Blandy, was the inventor.

The declarations of Blandy, if made as proved, it may fairly be presumed had reference to this agency of Wedge, and nothing more. It is also to be observed that all the facts tending to prove Wedge to be the inventor, are posterior in date, to the time when Blandy described the design to Wedge, and directed him to carry it into execution.

Invention is the work of the brain, and not of the hands. If the conception be practically complete, the artisan who gives it

reflex and embodiment in a machine is no more the inventor than the tools with which he wrought. Both are instruments in the hands of him who sets them in motion and prescribes the work to be done. Mere mechanical skill can never rise to the sphere of invention. The latter involves higher thought, and brings into activity a different faculty. Their domains are distinct. The line which separates them is sometimes difficult to trace; nevertheless, in the eye of the law it always subsists. The mechanic may greatly aid the inventor, but he cannot usurp his place. As long as the root of the original conception remains in its completeness, the outgrowth—whatever shape it may take—belongs to him with whom the conception originated. In the case before us there does not seem to be any pretense for saying that Wedge invented anything. He simply executed the design drawn by Blandy in the sand. All the engines since made have been substantially like the first one.

(2.) It is not alleged that the complainants abandoned their invention to the public, but it is insisted that they sold it and permitted it to be used more than two years before they applied for the patent.

The first engine was sold in the summer of 1855. From this time the complainants continued to make and sell them without intermission. They filed a caveat in the patent office on December 18, 1855. The first application for a patent was filed May 3, 1856. It was returned for amendment August 30, 1856—the commissioner holding that it claimed too much. On September 22, 1856, amended specifications were filed. They described clearly and distinctly the invention covered by the patent. On March 5, 1857, the complainants made a second affidavit of the originality of the invention. On May 2, 1857, the application was rejected. On June 15, 1857, it was again rejected upon appeal. The grounds of these rejections do not appear in the record, nor does it appear that the application was at any time withdrawn, or that a part of the sum deposited in the patent office was refunded, pursuant to section 7 of the act of 1836 [5 Stat. 120]. On May 26, 1858, the last application was filed. It was supported by numerous affidavits touching the novelty and value of the invention.

The specifications are the same in all material respects with those upon which the next preceding application was founded.

The statute (act of [March 3] 1839 [5 Stat. 354], § 7) is inflexible as to the time when the patent is to be applied for, with reference to the prior use and sale of the invention. The neglect to apply within two years after such sale or use is inevitably fatal. Whenever this fact appears, the patent falls. Whatever the circumstance. the courts have no dispensing power. But beyond this, the provision of the statute is silent. The application of May 3, 1856, was within the time prescribed. If that be held insufficient by reason of the defect in the specifications —a point which is not necessary to consider —the application of September 22, 1856—to which no objection lies—was also in time. The rejections were shown by the final action of the commissioner—which is sustained by the opinion of this court—to have been palpably wrong. The application of May 26, 1858, was, in itself, too late. But we think it may be properly held to have been in the nature of a petition for the review of the previous rulings, and to have related back to the prior application; and that the final action of the commissioner was not original and independent action, but a renewal and elongation of the former proceedings, and a reversal of the previous rejections. To the action of this revisory character, the statute imposes no limitation. There is nothing in the record tending to show that the complainants acquiesced in the second rejection as terminating their controversy with the patent office—or as conclusive of their rights. They ought not to be held responsible for the errors of others, which they could not prevent. We do not think their delay, between the rejection upon repeal, and the final application, was, under the circumstances, an unreasonable one; and we do not feel warranted, upon the facts before us, to adjudge the forfeiture of the valuable rights which their patent otherwise secures to them. It was suggested in the argument by one of the counsel for the complainants, that as the statute allows two years within which to make the application for a patent, after the sale and use of the invention, the same period, by analogy, should be given for the renewal of the application, after the rejection of a prior one. Whether this would be a proper rule to establish, we do not deem it necessary to determine.

We simply decide this part of the case before us, upon its own facts and circumstances as we find them disclosed in the record.

Adams v. Edwards [Case No. 53]; Bell v. Daniels [Id. 1,247]; Adams v. Jones [Id. 57]; Sayles v. Chicago & N. W. R. Co. [Id. 12,414].

(3.) Of the several bed plates older than the invention of the complainants, and alleged to be substantially the same with it— to which the testimony relates—the stress of the argument was confined chiefly to the one described in the depositions of Charles Talbott and John Souther.

This bed plate is more favorable to the defendants than any other to which our attention was called, and our remarks in this connection will be confined to it. They were cast at Richmond, Virginia. At first they were made solid. After the year 1845 or 1846, they were altered and cast hollow. The plate consisted of a frame cast in one or four pieces. The sides were hollow boxes

from four to eight inches square. They extended the whole length of the boiler. The frame was placed upon it. The parts were secured to the boiler by feet or flanges cast with them, and secured by bolts. Upon the bed plate so attached, the engine was placed, and firmly fixed there by bolts or rivets. Both the bed plate and engine were directly over the boiler. About the year 1853, feed pipes for the supply of water were introduced into the bed plate. The exhaust steam from the cylinder was passed along its entire length, and by that means heated the water before its entrance into the boiler. The object of the feet or flanges on the plate was to render the engine, as far as practicable, independent of the contraction and expansion of the boiler, and to relieve the boiler from the direct strain of the engine. In other words, the purpose was to effect, as far as was possible by the means employed, the insulation of the engine.

Here are certainly some striking points of analogy to the engine of the complainants. But able scientific experts have testified that the dominant conceptions in the two cases are totally distinct from each other, and that the differences are not merely mechanical or equivalent, but that they strike deeper, and are radical in their character. Whether they are so, is the test to be applied to the solution of the question before us. We have already held that the use of the plate as a heater is not a part of the invention patented. This subject may, therefore, be laid out of view. The essential diversities are to be found, it is said, in two particulars:

The bed plate covered by the patent is a single continuous shell or tube. It is proved that this gives a combination of lightness and strength beyond any other configuration or structure which has yet been devised.

The engine is attached to the outer side of the bed plate, and is not placed upon it or over the boiler. The attachment is lateral.

In both these points the proof is that it is essentially different from the Talbott engine, and from any other which preceded it.

In these views, after much reflection, we have found ourselves able to concur. It is not our business to form any opinion of the comparative value of the complainants' engine. The question is not whether the invention is better or worse than its predecessors, but whether it is new, useful, and different from anything before used or known. Those who hold the negative are at liberty to use anything older to which the proofs in this case relate. All required of them is that they shall not use, either in form or substance, what is patented to the complainants.

The rights secured by a patent for an invention or discovery are as much property as anything else, real or incorporeal. The titles by which they are held, like other titles, should not be overthrown upon doubts or objections capable of a reasonable and just solution in favor of their validity. This principle should be steadily borne in mind by those to whom is intrusted the adminstration of civil justice.

IV. Conceding the patent to be valid, it is insisted that the defendants have not infringed it.

In regard to this subject, we have had no difficulty and entertain no doubt. The slightest examination of the two models is sufficient to bring the mind to a satisfactory conclusion. The models are not present, and without them it is not possible to convey so clear an impression to the minds of others as was made upon our own. Upon such subjects the eye is a much more effective channel for the communication of knowledge than the ear. In the engine of the defendants which is complained of, we find the bed plate one single continuous hollow casting, extending the entire length of the boiler, and the engine attached to it laterally, exactly as in the complainants' engine. The only difference is that there is a slot or opening, extending longitudinally the entire length of the plate, on the side next to the boiler and just above the flanges by which the plate and boiler are connected together.

The defendants' bed plate and its attachments are in all respects those of the complainants', less the longitudinal opening mentioned.

A clear case of infringement is thus presented. It is vain for the defendants to deny this proposition. As well might an author who had taken a page from the book of another claim it as his own, because he had slightly modified the language in which the ideas were originally clothed. The defendants' engine is copied from the complainants'.

It is the same face, with a single feature a little mutilated. The defendants' bed plate by reason of the slot can not be used as a heater. This defect is obviated by putting a pipe within the slot or opening for that purpose. As the use of the complainants' bed plate as a heater is not covered by the patent, we need not remark upon this substitute of the defendants. It is of no consequence in the case.

We think the complainants are entitled to an injunction and an account of profits as prayed for in the bill. A decree will be entered accordingly.

[NOTE. Patent No. 21,059 was granted to H. & F. L. J. Blandy, August 3, 1858. For former application for a patent for a similar invention, see In re Blandy, Case No. 1,528, and, for proceedings on petition for leave to file a supplemental bill in the nature of a bill to review the foregoing decision, see Blandy v. Griffith, Id. 1,530.]